UNITED STATES of America,
Plaintiff–Appellee,

v.

Carlos Manuel CABRERA and Iran
Poch Mulgado, Defendants–
Appellants.

Nos. 99–10162, 99–10167.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 15, 2000

Filed Aug. 24, 2000

[redacted]

Scott Bindrup, Las Vegas, Nevada, for the defendant-appellant.

Gregory L. Denue, Las Vegas, Nevada, for the defendant-appellant.

Matthew A. Parrella, Assistant United States Attorney, Las Vegas, Nevada, for the plaintiff-appellee.

[redacted]

Before: LAY,* D.W. NELSON, and THOMAS, Circuit Judges.

D.W. NELSON, Circuit Judge.

Cabrera and Mulgado appeal their convictions for conspiracy to distribute, possession with intent to distribute, and distribution of crack cocaine. We reverse both Cabrera's and Mulgado's convictions because at their joint trial the lead detective injected extraneous, prejudicial material, including impermissible references to Cabrera and Mulgado's national origin.[1]

I.

In 1997, a confidential informant told the North Las Vegas Police Department that Carlos Cabrera was dealing crack cocaine. The informant arranged a meeting between Cabrera and two undercover police officers for July 3, 1997. At that initial meeting, Cabrera gave one of the officers, Detective William Brooks, a sample of crack cocaine, and they discussed possible drug transactions. There was no contact between Cabrera and the police for three months.

On September 23, 1997, Detective Brooks paged Cabrera and arranged the first of three drug buys. All three drug transactions were recorded on audio tapes. On September 30, 1997, Brooks arranged another meeting in which the FBI arrested Cabrera. After two of their prior meetings, the police had followed Cabrera to the apartment of his drug source—Iran Poch Mulgado. On the same day they arrested Cabrera, the police executed a search warrant for Mulgado's apartment. They found crack cocaine and cocaine cooking implements. During the course of the search, Mulgado admitted the crack cocaine was his and that he had been selling it.

Both Cabrera and Mulgado were charged with conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846, and several counts of distribution of a controlled substance and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). They both pleaded not guilty and were convicted at a joint trial.

As the government's lead witness, Detective Brooks testified at length at Cabrera and Mulgado's jury trial. Throughout his testimony, Detective Brooks made references to Cabrera and Mulgado's Cuban origin. For example, when asked why he failed to contact Cabrera for three months, Brooks responded:

> Well, we were currently doing other investigations. At this time period, *we were working a lot of Cubans in the*

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the United States Court of Appeals, Eighth Circuit, sitting by designation.

1. Since we are reversing on due process grounds, we decline to address Cabrera and Mulgado's other contentions. Cabrera argues that the district court erred in: (1) denying his motion for a mistrial after a government witness testified about Cabrera's prior grand larceny offense; (2) not making factual findings in denying his motion for a downward departure for sentencing entrapment; and (3) denying his proposed entrapment instruction. Mulgado argues that he was selectively prosecuted in violation of the Fifth Amendment's Due Process and Equal Protection Clauses because police officers targeted the Cuban community in Las Vegas.

**592**

*area.* And when I say in the area, of Maryland Parkway and Twain Area, and we decided to come back and try to contact this individual.

[Tr. 11] (emphasis added). On cross-examination, Officer Brooks elaborated on this statement.

Q: You mentioned that you were working Cubans in this investigation?

A: Well, I didn't mean to say just concerning the defendants in this case, but we had been working Cubans during this period of time, and there was quite a bit of Cuban—what's a good term for it—Cuban persons on various different cases. This wasn't the only case we had going at the time.

[Tr. 118] Detective Brooks later explained during cross-examination that his introduction to Cabrera was through a white female informant, and that he had not just been arresting Cubans.[2]

During the latter portion of Detective Brooks's cross-examination, he elaborated on his investigations of drug dealing in the Cuban community, an area Detective Brooks referred to as "Naked City":

A: [ ] So Naked City is a high population of Cubans that live there and [are] mostly good, and you have some bad ones that sell dope there and we investigate those guys.

Q: Okay. So it's your understanding that there were a lot of possible Cuban drug suspects in Las Vegas at that time?

A: No, I knew for a fact from previous cases and other intel that we had available, locations and things of that nature that don't involve your client., so I'm not saying this is just your client, I'm saying other investigations, this is just one of many we had.

---

**2.** Q: Have you arrested other people, other than Cubans, for drug violations?
   A: Everyone. Everyone.
   Q: You've arrested many various types of nationalities, is that what you are saying.

Q: So you have many investigations that didn't involve either of these defendants all over town at that time?

A: No, they're not responsible for all of the Cuban dope, I'm not saying that, but they were one of many investigations.

[Tr. 137–38.]

On direct examination, Detective Brooks also testified that the round, flat wafers of cocaine that he purchased from Cabrera were typical of members of the Cuban community. Brooks said:

It was a round flat, piece of cocaine which is—which is [the] typical way that a lot of Cubans do their drugs that can hide it in the—in a lot of places, you normally can hide it like in books....

[Tr. 16] On cross-examination, Detective Brooks was asked if the flat wafers indicated that the cocaine definitely came from the Cuban community.

A: I think when we get into the wafers, and to understand, and in every case that we had to date, when it's a wafer involved, it's a way that's—that the Cuban community cooks the drugs for all types of reasons I explained.... So, and indicative of what—of the way they work, and in the neighborhoods where there's a drug problem in the Cuban community, that's very indicative that you have to often take the person to the hospital and pump all of the rocks out of him because they swallow them because they're flat....

Q: So the fact that the cocaine was cooked in a flat, wafer-like shape, that indicates to you that it's solely related to a Cuban production?

A: Well, that's the way the Cubans cook and that's how we first came in contact with that type of cooking method

A: Yes.
[Tr. 132]

years ago when we were working Cuban cases and it was new to us then.

\* \* \*

Q: Have you also run into cocaine that was cooked in this wafer shape?

A: Only in Cuban cases.

Q: So you've never seen the non-wafer shape cocaine in a non-Cuban case?

A: No I have not. To say it's impossible, no, but it's indicative of the Cuban community. . . .

[Tr. 131–32.]

Finally, on direct examination, when asked about the simultaneous timing of the arrest and the serving of search warrants, Detective Brooks replied:

A: Yes, because normally if a person finds out a search warrant has been served on their house, they're gone, especially if there's a chance they're not an American citizen—

Q: Mm-hmm.

A: —or they're a resident alien, they may flee to another country and it would take time to catch up with them. . . .

[Tr. 76] On cross-examination, Cabrera's attorney attempted to clarify that his client was indeed a lawful alien with employment at the Las Vegas hotels. Detective Brooks replied:

A: [W]e have a lot of people who are legal aliens who have places to flee outside the country when they're wanted, say they may have family in Cuba, they have family in South America. And I know it happens a quite a bit and you don't get the guy right away and he knows he's wanted, so not to defame Mr. Cabrera, at all.

[Tr. 99] During cross-examination with Mulgado's attorney, Detective Brooks attempted to explain his Cubans-as-flight-risks theory.

A: And that's meant—that wasn't meant to be derogatory, you know because I'm really—

\* \* \*

A: Yeah. What I was saying is that we knew, if you know the history of how a lot of Cubans migrate to America, we know that they also have—when there's trouble, such as law enforcement, they have ways to get out of the country. And once that happens, it's really tough and difficult to make an arrest.

\* \* \*

Q: Okay. So it's your belief that Cubans can return to Cuba?

A: No, that's not what I said. I said that a lot of times people that are Cuban have Cuban relatives in Cuba. So not only do they have possibly that place to go in Cuba or wherever it is, but they have places in the United States. And either way, whether they're Cuban or American, if you don't catch a person at the time you're going to serve a warrant, they know that they've been hit, there's an investigation that is naming them as a suspect. So normally they'll run, whether it's in the country or overseas, it makes it difficult for us to track'em down.

[Tr. 133–34]

On re-direct examination, the government made no attempt to clarify or explain Detective Brooks's generalizations about Cubans. At the end of Brooks's direct examination, the district court denied the government's motion to admit Cabrera's prior criminal history. The district court, however, allowed the government to bring out that Cabrera's work card had been revoked. On re-direct, when instructed to answer yes or no whether Cabrera's work card had been revoked, Detective Brooks replied: "Yes, for grand larceny, I believe." The second half of the answer was stricken, and the trial judge immediately admonished the jury to disregard it. The district court also issued a curative instruction at the end of the trial. Cabrera's request for a mistrial was denied.

Cabrera and Mulgado were each sentenced to 160 months in prison. Both timely appealed.

## II.

■ Appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial. We recently found that "[i]t is evident under clearly established federal law that this very kind of conduct by a prosecutor (to the extent that it involves either race or ethnicity) violates a criminal defendant's due process and equal protection rights." *Bains v. Cambra,* 204 F.3d 964, 974 (9th Cir.2000) (affirming because of the harmless error standard for habeas review of state court decisions). *Bains* held that it was error for a prosecutor to use trial testimony about the Sikh religion in order to generalize that "all Sikh persons (and thus [the defendant] by extension) are irresistibly predisposed to violence when a family member has been dishonored." *Id.* The facts of *Bains* are distinguishable from this case, however, because all of the improper references in *Bains* occurred during the prosecutor's closing argument.

Although the *Bains* panel affirmed because it was a habeas review of a state court decision, it cited numerous authorities recognizing that references to racial, ethnic, or religious groups are not only improper and prejudicial but also reversible error. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 309 n. 30, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (noting that "[t]he Constitution prohibits racially biased prosecutorial arguments"); *United States v. Vue,* 13 F.3d 1206, 1212–13 (8th Cir.1994) (a customs agent's testimony about the tendency of Hmong people to smuggle opium into the Twin Cities was reversible error); *United States v. Cruz,* 981 F.2d 659, 663– 64 (2d Cir.1992) (references to the defendant as "the Dominican" and a DEA agent's testimony about a New York City neighborhood where drug transactions took place as having "a very high Hispanic population" were reversible error); *United States v. Doe,* 903 F.2d 16, 20 (D.C.Cir. 1990) (trial testimony and closing arguments about Jamaicans taking over Washington, D.C.'s crack cocaine market was reversible error).

According to Mulgado, the Eighth Circuit's *Vue* decision is the most factually analogous to this case. In *Vue,* a customs official testified that " 'there are other populations of individuals from Southeast Asia in the Twin Cities, but primarily the opium smuggling cases we have identified or we've investigated relate[ ] to Hmong individuals.' " *Vue,* 13 F.3d at 1212. Furthermore, the customs official estimated the Hmong people were responsible for 95 percent of the opium smuggled into the Twin Cities. *See id.* The Vue brothers, who had immigrated from Laos and were of the Hmong ethnic descent, were convicted of drug and firearm charges. *See id.* at 1207. Their lawyer had contemporaneously objected to the generalizations at trial. *See id.* at 1212. Although the panel believed that the evidence was sufficient to convict the Vues, it reversed their convictions because the impermissible generalizations about the Hmong people was error

> of constitutional dimension, because the injection of ethnicity into the trial clearly invited the jury to put the Vues' racial and cultural background into the balance in determining their guilt. We view this as a serious trespass on the rights to due process and equal protection guaranteed to the Vues by the fifth amendment. Formal equality before the law is the bedrock of our legal system, and we are determined that that principle will not be undermined.

*Id.* at 1213.

The Second Circuit's decision in *Cruz* also is analogous. The government's star witness was only able to identify and frequently referred to the defendant as "The Dominican." *See Cruz,* 981 F.2d at 660– 61. A DEA agent corroborated the witness's testimony and recounted "travel by a Hispanic drug dealer and Hispanic middleman from the Capital District to Washington Heights, an area that is inhabited by Hispanics in thousands of apartments and is a source of drugs.... " *Id.* at 663. The Second Circuit reversed because "[i]njection of a defendant's ethnicity into a

trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here." *Id.* at 664.

Finally, the D.C. Circuit's decision in *Doe* is particularly instructive because the bulk of the inadmissible evidence involved the trial testimony of a police detective who gave a detailed description of the Jamaican drug trade in Washington, D.C. *See Doe,* 903 F.2d at 19. The detective said: " 'the retail market has been taken over basically by Jamaicans....' " *Id.* at 20. The government explained that " 'the expert testimony concerned the activities of [only] Jamaican *drug dealers,* not all Jamaicans,' " therefore reducing the appeal to juror bias. *Id.* at 19.

The D.C. Circuit rejected this explanation, finding the references to Jamaicans in a trial involving Jamaican defendants to be reversible error:

> It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case. We refuse to quibble, as does the Government, over whether the remarks about Jamaicans during Rawls' testimony referred strictly to race, for it simply does not matter. In legal theory, distinction based upon ancestry are as "odious" and "suspect" as those predicated on race; in practical terms, appeals to either threaten the fairness of a trial.

*Id.* at 21–22 (footnotes omitted).

Moreover, the D.C. Circuit's pointed condemnation of the prosecutor's "racially inflammatory remarks during governmental summation" are equally relevant to the analysis facing us in the instant appeal:

> Racial fairness of the trial is an indispensable ingredient of due process and racial equality a hallmark of justice.... We speak, of course, only of racial comments beyond the pale of legally acceptable modes of proof. An unembellished reference to evidence of race simply as a factor bolstering an eyewitness identification of a culprit, for example, poses no threat to purity of the trial. The line of demarcation is crossed, however, when the argument shifts its emphasis from evidence to emotion. When that is done, it matters not whether the reference is to race, ancestry, or ethnic background.

*Id.* at 25 (citations omitted). Although Doe's lawyer failed to object to the impermissible prosecutorial summation at trial, the D.C. Circuit reversed because "plain error review is entirely appropriate when the matter complained of ' "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings...." ' " *Id.* at 26 (citations omitted).

▉ In this case, the improper testimony came in through Officer Brooks, not through the prosecutor during closing argument. Neither Mulgado nor Cabrera contemporaneously objected to these statements at trial, therefore we review them for plain error.[3] Plain error is "clear" or "obvious" error that affected the defendant's substantial rights and that "seriously affected the fairness, integrity or public

---

3. Although only Mulgado's opening brief objected to Detective Brooks's references to Cubans, we apply our findings to both Cabrera and Mulgado for the following reasons. First, Detective Brooks's testimony affected them equally at their joint trial. Second his repeated references to Cubans was " 'plain error' and therefore reversal is 'necessary to prevent a miscarriage of justice.' " *United States v. Ullah,* 976 F.2d 509, 514 (9th Cir. 1992) (quoting *United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986)). Third, it is a " 'manifest injustice' to reverse the conviction of one co-defendant but to uphold the conviction of another co-defendant when the same error affected both defendants." *Id.* (citing *United States v. Olano,* 934 F.2d 1425, 1439 (9th Cir.1991), *rev'd on other grounds,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Finally, there was no Ninth Circuit decision clearly on point about this issue until *Bains v. Cambra,* 204 F.3d 964 (9th Cir.2000), which came down after the briefs were filed in this case. *See Louisiana–Pacific Corp. v. ASARCO, Inc.,* 24 F.3d 1565, 1583 (9th Cir. 1994) (holding that a party may pursue an issue not raised in its initial brief where a substantial change in law occurs after the brief was filed). After *Bains* came down, the court ordered the parties to be prepared to discuss the case at oral argument.

reputation of the judicial proceedings." *United States v. Vences*, 169 F.3d 611, 613 (9th Cir.1999).

The Federal Rules of Evidence guide our inquiry into whether the evidence was relevant and admissible. Rule 401 defines relevant evidence as "having the tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed.R.Evid. 401. Rule 402 provides that "[e]vidence which is not relevant is not admissible." Fed.R.Evid. 402. Rule 403 says: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

▆▆▆ Most of Officer Brooks's references to Cubans were not relevant under Rules 401 and 402. For example, Officer Brooks's initial statement about "working Cubans" in the Las Vegas area was in response to a question about the three-month gap between the police's first and second contact with Cabrera. The government argues that "[w]hen Detective Brooks used the term 'Cubans' he plainly did not mean Cubans in general; rather, he referred to those other specific Cubans that were also under investigation at the time." But highlighting the ethnicity of the other Cuban drug dealers under investigation at the time was not relevant to the reason for the three-month gap; the reference merely made it seem more likely in the eyes of the jury that Cabrera and Mulgado were drug dealers because of their ethnicity. Furthermore, Detective Brooks's testimony made it seem like the Las Vegas drug market was falling under the control of Cuban drug dealers, akin to the situation in *Doe* where the detective testified that Jamaicans were taking over Washington, D.C.'s drug trade. Officer Brooks' repeated references to Cuban drug dealers had the cumulative effect of putting the city of Las Vegas's Cuban community on trial, rather than sticking to the facts of Cabrera and Mulgado's drug offenses.

In addition, Officer Brooks's testimony about how Cubans package their drugs may have been relevant to other aspects of the case; however, it was prejudicial because it added to the perception that Cuban drug dealing was a city-wide problem in Las Vegas. We surmise that Officer Brooks's discussion of the packaging attempted to show that Cabrera and Mulgado were experienced drug dealers, eliminating a defense of police entrapment. Officer Brooks just as easily could have testified that the wafer packaging was common among the city's "experienced" drug dealers, maintaining the statement's probative value and eliminating its prejudicial effect. Once again, it was unnecessary to inject Cabrera and Mulgado's national origin into the trial. Under Rule 403, therefore, we find that all of Officer Brooks's references to Cuban drug habits were improper and inadmissible.

Finally, Officer Brooks's comments about Cubans tending to be flight risks only reinforced the notion of foreign drug dealers infiltrating the Las Vegas community. Although Cabrera and Mulgado may have been flight risks necessitating simultaneous arrest and search warrants, generalizing in front of the jury that Cubans tended to be flight risks was unnecessary and prejudicial.

In a related matter, Detective Brooks's testimony about Cabrera's prior conviction also indicates his willingness to inject prejudicial evidence into the trial. The district court had just informed the government that Cabrera's prior convictions were inadmissible. In light of Detective Brooks's improper references to Cubans, his testimony about Cabrera's prior convictions seems to be neither accidental nor harmless.

## III.

Although we find that the evidence was sufficient to convict Cabrera and Mulgado, Detective Brooks's repeated references to their Cuban origin and his generalizations about the Cuban community prejudiced Cabrera and Mulgado in the eyes of the jury. We recognize that the defense failed

to object to these statements at trial, and insisted that Detective Brooks explain his references to Cubans on cross-examination. Detective Brooks, however, initiated all of his improper comments—about "working Cubans," the way Cubans package their drugs in wafers, and that resident aliens tend to be flight risks—on direct examination. Thus, we hold that the admission of Detective Brooks's improper references to Cubans was plain error.

The fairness and integrity of criminal trials are at stake if we allow police officers to make generalizations about racial and ethnic groups in order to obtain convictions. People cannot be tried on the basis of their ethnic backgrounds or national origin. We agree with the D.C. Circuit's decision in *Doe* that in some instances, such as eyewitness identification, a defendant's race or ethnicity is relevant and not prejudicial. That was not the case here. Therefore, in order to protect Cabrera and Mulgado's due process and equal protection rights to a fair trial, we are compelled to reverse their convictions and remand.

REVERSED AND REMANDED.