**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

MICHAEL C. NOBARI,
            *Defendant-Appellant.*

No. 06-10465

D.C. No.
CR-03-05453-
OWW-3

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

EDDY A. GEORGE,
            *Defendant-Appellant.*

No. 06-10488

D.C. No.
CR-03-05453-
OWW-2

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

EDISON SHINO,
            *Defendant-Appellant.*

No. 06-10496

D.C. No.
CR-03-05453-
OWW-4

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

RITO S. ZAZUETA,
            *Defendant-Appellant.*

No. 07-10149

D.C. No.
CR-03-05453-
OWW-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
February 10, 2009—San Francisco, California

Filed July 24, 2009

Before: Ronald M. Gould, Richard R. Clifton, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Clifton

## COUNSEL

Suzanne A. Luban (argued), Oakland, California, for defendant-appellant Michael C. Nobari; Roger T. Nuttall (argued), Nuttall & Coleman, Fresno, California, for defendant-appellant Eddy A. George; Carolyn D. Phillips (argued), Fresno, California, for defendant-appellant Edison Shino; and Nicholas F. Reyes, Fresno, California, for defendant-appellant Rito S. Zazueta.

McGregor W. Scott, United States Attorney, and Karen A. Escobar (argued), Assistant United States Attorney, Fresno, California, for the plaintiff-appellee.

---

**OPINION**

CLIFTON, Circuit Judge:

Michael Nobari, Eddy George, Edison Shino, and Rito Zazueta appeal from their jury trial convictions for conspiracy to aid and abet the manufacture of methamphetamine and attempted illicit possession of pseudoephedrine. Nobari and Zazueta also appeal their convictions for possession of a firearm in furtherance of a drug trafficking crime. Only George appeals the sentence he received.

The defendants raise several claims on appeal, including an allegation that the prosecution improperly presented, as evidence of the defendants' guilt, testimony that drew generalizations on the basis of ethnicity about "Middle Easterners" and "Mexicans." Although we conclude that errors were made at trial in this instance and others, we hold that these errors do not warrant reversing the defendants' convictions, given the strength of the unobjectionable evidence against them. Accordingly, we affirm the convictions. We also affirm George's sentence because the district court neither miscalculated the Guidelines range nor improperly considered the relevant sentencing factors.

## I.  Background

Agents of the Drug Enforcement Administration (DEA) and the Fresno Methamphetamine Task Force arrested Nobari, George, Shino, and Zazueta after they attempted to purchase 22 buckets of pseudoephedrine pills from an undercover agent on November 20, 2003, in Turlock, California.

George arranged the drug transaction. To do so, he communicated first with a confidential informant for the government ("Informant"), and subsequently with an undercover DEA agent ("Agent"). On the day before the attempted purchase, George agreed to buy 200 cases of pseudoephedrine pills from the Agent for a price of $400,000.

The next day, George and Nobari arrived together in George's vehicle at a McDonald's parking lot in Turlock, met the Agent there, and arranged the pseudoephedrine pill transaction. The Agent later showed George and Nobari the contents of an Enterprise rental truck, which held approximately 22 seven-gallon buckets filled with pseudoephedrine pills (each bucket the equivalent of five cases of pills). The Agent indicated that the price per bucket was $10,000. George and Nobari then left the parking lot to "talk to [their] people" and obtain the purchase money, and they drove to Shino's residence where they met with Shino and Zazueta. All four defendants later drove to the McDonald's parking lot. Once there, Shino handed George a bag of money containing $20,000 in cash. George and the Agent then entered George's vehicle to look at the money, which was less than the $70,000 that the Agent testified he had been promised. Believing he was the victim of a "rip-off" that might turn violent, the Agent called his supervisor from a cell phone. In light of the perceived danger, assisting officers were immediately summoned to arrest the defendants.

All four defendants were indicted on charges of conspiring to aid and abet the manufacture of methamphetamine and to possess pseudoephedrine knowing or having reasonable cause to believe it would be used to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (c)(2), 846 (Count One); attempting to possess pseudoephedrine knowing or having reasonable cause to believe it would be used to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(c)(2), 846 and 18 U.S.C. § 2 (Count Two); and pos-

sessing a firearm in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three).

After a ten-day trial, a jury found each defendant guilty on Counts One and Two (the drug charges). The jury also convicted Nobari and Zazueta on Count Three (possession of a firearm in furtherance of drug trafficking crimes), but acquitted George and Shino of that charge. The district court denied the defendants' subsequent motions for a new trial. The court sentenced George, the only defendant to challenge his sentence on appeal, to a prison term of 170 months. Nobari received a sentence of 181 months, Shino was sentenced to 190 months, and Zazueta received 300 months.

## II. Discussion

### A. Challenges to the Convictions

#### 1. Ethnic Generalizations

All four defendants claim that the prosecution violated their constitutional rights to due process, equal protection, an impartial jury, and a fair trial by eliciting testimony about the roles that "Middle Easterners" and "Mexicans" typically play in the pseudoephedrine pill trade and by subsequently linking these "ethnic generalizations" to the defendants. Nobari, George, and Shino, who are of Middle Eastern descent, and Zazueta, who is of Mexican descent, assert that the government improperly "argued ethnicity as evidence of guilt."

#### a. Background

The prosecution broached the subject of which ethnic groups ordinarily occupy certain positions in the pseudoephedrine trade in its cross-examination of the Informant, who was called as a defense witness by George's attorney to support George's claim of entrapment. On cross-examination, the government sought to neutralize efforts by the defense to

impeach the Informant. At one point during his testimony on cross-examination, the Informant referred to his co-defendants from a previous case as "Middle Easterns." The prosecution used this reference to launch the following set of questions:

Q.  And speaking of Middle Easterns, based on your experience in the pill business, what — are there Middle — I mean, do you — did you conduct business with Middle Easterns?

A.  Mexicans.

Q.  In what capacity did you know Mexicans?

A.  Cooks.

Q.  Have you ever known, in the — your pill trafficking, Middle Easterners to actually cook?

A.  There isn't a Middle Eastern that cooks, no.

Q.  What primarily do the Middle Easterns —

A.  We bring it from Canada to Chicago to California.

Q.  Do the Middle Easterners serve primarily as pill brokers?

A.  Brokers, yes.

Q.  And in your experience, the Mexicans, as they were referred to even in these conversations with Eddy George, based on your experience, they would be the people involved in actually extracting the ephedrine from the pills to make the methamphetamine?

A. They're the cookers, that's their secret. You know, they never let us know their secret of cooking. That's who cooks the pseudo and did all the pseudo. They called it cooking.

The defense did not object at the time to this line of questioning.

The prosecution then asked similar questions on direct examination of a DEA agent ("DEA Witness" or "Witness") who had taken part in an earlier phase of the investigation. The following exchange came during a series of questions that the prosecutor asked the Witness to answer on the basis of his "training and experience" as a DEA agent:

Q. Do certain ethnic groups, Mexicans, perform certain roles within the methamphetamine, methamphetamine organization?

A. Based on — based on my experience with the wiretaps and other investigations, the individuals handling the pseudoephedrine are of Middle Eastern descent and they talk about trying to get the pseudoephedrine to California —

. . .

Q. And what, based on your training and experience in the investigation of methamphetamine labs, is there — what was the role of the Mexicans?

A. The pseudoephedrine would be given to a Mexican cook and it would be converted with other chemicals into methamphetamine.

Q. Based on your training and experience in investigating pseudoephedrine pill cases, [have you]

seen Middle Easterners participate in pseu-
doephedrine pill trafficking?

A.   Yes.

Q.   A large number?

A.   Yes.

Q.   And based on your training and experience,
what is the role that Middle Easterners play?

A.   The cases that I have been involved in, the Mid-
dle Easterns were secreting the pseudoephe-
drine from Canada into the United States with
the final destination being California.

Q.   And typically, what is the role that they — are
they involved directly in the manufacturing pro-
cess, the Middle Easterners?

A.   Based on my experience, the Middle Easterners
are simply controlling the pseudoephedrine
trade and, as a middle man, and getting the pills
to a cook.

Q.   Who you have [sic] seen based on your training
and experience to be what ethnic background?

A.   For which?

Q.   The cooks.

A.   Of Mexican descent.

The defense did not object to the substance of the DEA Wit-
ness's testimony while he was on the stand.

The next morning, before the jury was called, defense counsel moved to strike the testimony of the Witness and the Informant concerning ethnic groups. Rather than strike the testimony, the court gave the following limiting instruction to the jury:

> Now, I want you to understand that [the DEA Witness's] testimony is to be considered by you only in the context of this case and the evidence that is in this case and his particular perspective in the Chicago area.
>
> You are not to consider that to suggest that any particular ethnic group or persons of a particular racial origin have these characteristics or tendencies or that where a person is born or what a person's ethnicity is has anything to do with whether he or she is likely or not likely to engage in criminal activity.

The prosecution returned to the ethnic generalizations in its closing argument, ostensibly to refute the defense's claims that the prosecution was engaging in "racial and ethnic profiling":

> [W]ithin the context of methamphetamine manufacturing, the fact that George, Shino and Nobari happened to be Assyrian, happened to be Middle Eastern is significant because, as you heard, Middle Easterners typically occupy the role of pill broker and are not involved in the actual manufacture of methamphetamine.
>
> Within the context of methamphetamine manufacturing, the role of obtaining pills for the manufacture of methamphetamine is typically assumed by Mexicans. In fact, as you heard in many of the recordings, George himself talks about unloading the pills to the

Mexicans, who in his experience would take 50 cases at a time.

The district court overruled a subsequent defense objection "to the prosecutor's reference to heritage," but reminded the jury that "heritage is not in evidence and therefore you should not treat that as having been proved."

### b.   Standard of Review

"When the defendant objects to alleged prosecutorial misconduct, the standard of review is abuse of discretion." *United States v. Steele*, 298 F.3d 906, 910 (9th Cir. 2002). We conclude that the defendants' objections here qualify as timely under Federal Rule of Criminal Procedure 51(b), so we will consider whether the district court abused its discretion in allowing the contested testimony and argument. Nevertheless, "establishing that there has been prosecutorial misconduct is not in and of itself sufficient to merit reversal" of the defendants' convictions. *United States v. Blueford*, 312 F.3d 962, 973 (9th Cir. 2002). Rather, we must consider whether any such misconduct was harmless. *Id.* We therefore apply harmless error analysis to the misconduct claim we address in this section, as well as to those claims we consider in subsequent sections, so long as the defendants entered a timely objection at trial.

### c.   Analysis

**[1]** We have held that "[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial." *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000). Specifically, clearly established federal law provides that such prosecutorial conduct "violates a criminal defendant's due process and equal protection rights." *Bains v. Cambra*, 204 F.3d 964, 974 (9th Cir. 2000); *see also United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990) ("Racial fairness of the trial is an

indispensable ingredient of due process and racial equality a hallmark of justice." (citations omitted)). These conclusions follow from the premise that "[p]eople cannot be tried on the basis of their ethnic backgrounds or national origin." *Cabrera*, 222 F.3d at 597.

In *Cabrera*, we reversed two defendants' convictions for crack cocaine offenses, having found that "at their joint trial the lead detective injected extraneous, prejudicial material, including impermissible references to Cabrera and Mulgado's national origin" of Cuba. *Id.* at 591. At trial, the detective repeatedly referred to drug activity among "Cubans" in Cabrera's neighborhood. *Id.* at 591-92. The detective "also testified that the round, flat wafers of cocaine that he purchased from Cabrera were typical of members of the Cuban community" and that he had only seen such a form of cocaine "in Cuban cases." *Id.* at 592-93. Finally, the detective suggested that Cubans tended to be flight risks. *Id.* at 593. We analyzed these statements under the Federal Rules of Evidence and found that "[m]ost of [the detective's] references to Cubans were not relevant under Rules 401 and 402." *Id.* at 596. Although the testimony about drug packaging may have been relevant, it also was prejudicial and should have been excluded under Rule 403 balancing. *Id.* We then reversed the defendants' convictions under plain error review despite finding that "the improper testimony came in through [the detective], not through the prosecutor during closing argument," *id.* at 595, and that the *defense* "insisted that [the detective] explain his references to Cubans on cross-examination," *id.* at 597, potentially exacerbating the harm caused by the direct examination. We explained why we were reversing the convictions, notwithstanding these (potentially) mitigating factors: "The fairness and integrity of criminal trials are at stake if we allow police officers to make generalizations about racial and ethnic groups in order to obtain convictions." *Id.*

Similarly, in *Bains*, we found the use of ethnic generalizations impermissible where the prosecutor employed trial testi-

mony about the Sikh religion to suggest that "*all* Sikh persons (and thus [the defendant] by extension) are irresistibly predisposed to violence when a family member has been dishonored . . . and also are completely unable to assimilate to and to abide by the laws of the United States . . . ." 204 F.3d at 975. Although the evidence of Sikh beliefs had been properly admitted for other purposes, "the introduction of clearly inflammatory prosecutorial arguments very well might have had the effect of motivating the jury to draw and to focus upon the impermissible inferences" from the testimony. *Id.* The *Bains* Court nevertheless affirmed the defendant's conviction under the less stringent standard for habeas review of state court decisions established by *Brecht v. Abrahamson*, 507 U.S. 619, 636-38 (1993). *Bains*, 204 F.3d at 977-78.

In both *Cabrera* and *Bains*, we reviewed numerous authorities recognizing that references to racial or ethnic groups are improper. *See Cabrera*, 222 F.3d at 594-95; *Bains*, 204 F.3d at 974-75. In one noteworthy case, *United States v. Vue*, 13 F.3d 1206 (8th Cir. 1994), the Eighth Circuit reversed the convictions of brothers who were of Hmong ethnic descent. At trial, a government customs supervisor testified that "primarily the opium smuggling cases we have identified or we've investigated relate to Hmong individuals" and estimated that 95 percent of such cases in the area were attributable to persons of Hmong descent. *Id.* at 1212. The Eighth Circuit found error "of constitutional dimension, because the injection of ethnicity into the trial clearly invited the jury to put the Vues' racial and cultural background into the balance in determining their guilt." *Id.* at 1213.

The testimony and argument in the case before us is similar to what was introduced in the cases where our circuit and others have identified error. *See Cabrera*, 222 F.3d at 597; *Bains*, 204 F.3d at 975; *Vue*, 13 F.3d at 1213. The prosecution deliberately elicited testimony from the Informant and the DEA Witness that it then used in closing argument to link the ethnicity of the defendants to the roles typically played in the

pseudoephedrine pill trade by members of their respective ethnic groups. The prosecution's syllogism reduced, in essence, to this: (1) Middle Easterners typically are pseudoephedrine pill brokers, and Mexicans typically obtain the pills and cook methamphetamine; (2) Nobari, George, and Shino are Middle Eastern, and Zazueta is Mexican; (3) therefore, Nobari, George, and Shino played the role of pill brokers, and Zazueta was the cook. *Cf. Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1007 (9th Cir. 2001) (addressing a similar syllogism in a civil case). "Our caselaw, and that of other circuits, establishes that this is an impermissible syllogism." *Id.* Indeed, the deliberateness with which the prosecution elicited the ethnic generalization testimony and later referred to it in closing argument makes this conduct at least as objectionable as the introduction of testimony in *Cabrera*, where no comparable reference was argued to the jury, 222 F.3d at 591-93, or the closing argument made in *Bains*, which drew from evidence that was properly admitted for a legitimate purpose, 204 F.3d at 975.

In denying the defendants' motions for new trial, however, the district court analogized this case not to *Cabrera* or *Bains*, but instead to *United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995). In *Santiago*, we found no constitutional violation in a trial during which the gang names "Mexican Mafia" and "Latin Kings" were used, and in which the prosecution presented testimony that referenced the defendant's presence at a prison recreation center for Mexican Americans and demonstrated that 25 percent of the Hispanic population would have the same blood type as the defendant. *Id.* at 890. Holding that "the government did not appeal to emotion in any of the examples cited" but rather simply "elicited relevant testimony that alluded to the ethnic background of certain prisoners," we denied an equal protection challenge. *Id.* at 891. The facts of *Santiago* have little in common with those here. *Santiago* featured ethnic terms exclusively in the context of explaining relevant facts, while the present case includes repeated discussion of ethnic role stereotypes in the methamphetamine

trade, introduced by the prosecution in a manner that may have encouraged the jury to view the defendants as fitting an ethnic-based pattern of criminal activity.

On appeal, the government argues that George opened the door to ethnic generalization testimony by introducing recordings of his conversations with the Informant in support of his entrapment defense. As the government accurately notes, "[t]hose recordings contained numerous and sometimes pejorative references to 'Mexicans,' " the people to whom George claimed he would resell the pseudoephedrine, as well as to "people of Middle Eastern descent." The government contends that it was entitled to question the Informant and the DEA Witness about the meaning of George's "ethnic-based references" to dispute his entrapment defense and to make the conversation between George and the Informant comprehensible.

**[2]** The government is correct that the ethnic generalization testimony was relevant under Federal Rule of Evidence 401, if only to a small degree, for helping make sense of the conversation between George and the Informant in which they discussed George's interest in making a pseudoephedrine purchase. *See* Fed. R. Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). However, the minimal probative value of the evidence was substantially outweighed by the danger of unfair prejudice inherent in its admission, as the testimony encouraged the jury to convict the defendants on the basis of their membership in a particular ethnic group, rather than on the strength of the government's case. *See* Fed. R. Evid. 403. As such, the evidence should have been excluded under Rule 403. *See id.*; *Cabrera*, 222 F.3d at 596.[1]

---

[1]The limiting instruction given by the district court the morning after the Informant and the DEA Witness testified did not effectively address any prejudice that their testimony may have caused the defendants. Asking the jury to consider the DEA Witness's testimony "only in the context of this case and the evidence that is in this case" did not help matters.

**[3]** The district court abused its discretion by admitting the testimony and allowing the closing argument concerned with ethnic generalizations, as the introduction of these remarks violated the defendants' due process and equal protection rights. *See Cabrera*, 222 F.3d at 594, 597; *Bains*, 204 F.3d at 974. After considering the defendants' remaining challenges to their convictions, we will discuss the basis for our conclusion that this error, in combination with any others, was harmless beyond a reasonable doubt. *See, e.g.*, *United States v. Bushyhead*, 270 F.3d 905, 911 (9th Cir. 2001) ("A constitutional error may be disregarded only if it is harmless beyond a reasonable doubt.").

### 2. *Appeals to the Passions of the Jury*

**[4]** The defendants allege that the prosecution improperly "inflamed the jury's passions and fears," in violation of due process, on five occasions. As the defendants point out, "[w]e have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005). Statements "clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact" are "irrelevant and improper." *Id.* at 1150. In particular, prosecutors " 'may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.' " *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996).

**[5]** The defendants begin by claiming that the prosecution violated this rule through "improperly appeal[ing] to biases and fears about people from the Middle East" by eliciting ethnic generalization testimony and discussing it in closing argu-

ment, as described in the preceding section. Although we hold that the prosecution violated the defendants' rights to a fair trial by presenting this testimony, we do not likewise conclude that the same conduct improperly appealed to the passions of the jury. The testimony and argument were improper for introducing ethnic-based stereotypes that the jury could use to infer that individual defendants were guilty, but it did not cross another line by, for instance, pointing to a crisis of Middle Eastern drug dealing in Turlock and "ask[ing] the jury to make a statement." *United States v. Leon-Reyes*, 177 F.3d 816, 823 (9th Cir. 1999). The government's appeal was not prejudicial by way of "comments calculated to arouse the passions or prejudices of the jury." *Id.* at 822.

Second, according to the defendants, the government impermissibly presented evidence at trial about "Operation Mountain Express," a DEA operation to combat international trade in pseudoephedrine pills. Over defense objections, a government witness described this large-scale investigation and testified that the current case was a spin-off. The district court did not abuse its discretion in allowing the testimony, as it arguably was responsive to earlier defense questions that revealed that the DEA investigation in this case was initiated in 2001, two years before the offense conduct occurred in late 2003.

Third, the defendants challenge the prosecution's reference in closing argument to a "little boy" who was leaving McDonald's right as the defendants were arrested in the restaurant's parking lot. The prosecutor stated: "Had these agents not been out there, this would have been another drug rip and who knows what would have happened to the little boy that was coming out of that McDonald's." The court sustained a defense objection and gave the following instruction: "The jury will determine what bearing any testimony or evidence has on the issues to be decided." The prosecution's comment was an improper appeal to jurors' emotions and fears. *See Weatherspoon*, 410 F.3d at 1149-50. Because the prosecutor

never indicated that she was rebutting any claim by the defense, we are not persuaded by the government's argument on appeal that the comment was properly responsive to the suggestion by George's attorney in closing argument that the government showed a lack of concern for other human beings. While the district court sustained an objection to the prosecutor's comment, it did not instruct the jury to disregard the statement, as it should have. The prosecution's reference to the "little boy," therefore, was an improper statement that was not sufficiently neutralized by the court.

Fourth, the defense claims that the prosecution also sought to appeal to the jury's emotions and fears by emphasizing "the concern in the voice of [the Agent]" on the tape of the drug bust. In the prosecutor's words, the Agent expressed "concern for another human being as Mr. Nuttall [George's attorney] would say, genuine concern. Because he knew this was a volatile situation . . . . These drug traffickers pose a real and viable threat. Had it not been for the intervention of these law enforcement officers, it was a volatile situation. There was a real danger." Unlike the prosecution's reference to the boy in the McDonald's parking lot, this statement was directly responsive to a suggestion made by George's attorney that the government failed to exhibit "genuine concern" for other people. Even if we viewed this statement, in part, as calculated to appeal to jurors' emotions, it was a permissible "invited response" to the defense's argument. *See United States v. Young*, 470 U.S. 1, 11 (1985). No error was committed here.

Finally, right after making these comments, the prosecutor continued with the following statement, to which the defense did not object at trial but cites now as improper: "The City of Turlock should be thankful to law enforcement for their efforts in diffusing a volatile situation, for finding these drug traffickers and you, ladies and gentlemen, should not let the City of Turlock down." These comments, which came at the end of the prosecution's closing argument, appear designed to encourage the jury to view the government's case more favor-

ably by appealing to positive emotion for the law enforcement officers involved in the drug bust. *See Weatherspoon*, 410 F.3d at 1149. This was improper commentary and should have been struck from the record, as a prosecutor may not "tell[ ] the jury it had any obligation other than weighing the evidence." *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986); *cf. Koon*, 34 F.3d at 1443 (barring prosecutors from urging a conviction "to protect community values" (internal quotation marks omitted)).

**[6]** In sum, we have identified two errors at trial that involved the introduction of argument designed to appeal "to the passions, fears and vulnerabilities of the jury," *Weatherspoon*, 410 F.3d at 1149: the district court's failure to instruct the jury to disregard, first, the prosecution's reference to the "little boy" exiting the McDonald's as the defendants were arrested and, second, the prosecution's appeal to the jury to "not let the City of Turlock down."

The defendants raise a number of additional arguments, but none of the arguments breaks new ground, and, with one exception, we find no further error. Accordingly, we will discuss the remaining claims in abbreviated fashion, providing limited factual and legal background for each.

### 3.  Vouching

The first of these claims is the defendants' allegation that the prosecutor repeatedly vouched for herself and for prosecution witnesses. None of the examples the defendants cite, however, constitute improper vouching.

First, the defendants contend that the prosecution vouched for the credibility of the Informant by "expressing that the informant's truthfulness had already been determined by a different prosecutor and a federal judge and verified by a polygraph." We do not find vouching here. To begin, the Informant was called by the *defense* as a witness, not by the

prosecution. Although the Informant played an integral role in advancing the underlying government investigation, vouching typically involves the prosecution bolstering the testimony of its *own* witness. *See United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002). Moreover, the prosecution's questioning here focused on the Informant's fulfillment of the terms of a *past* plea agreement requiring him to provide truthful information and testimony. That is, the prosecution was not using the plea agreement to show that the Informant was under any special obligation to give truthful testimony in the present case, but rather that he successfully had done so before. Finally, by attempting on direct examination to impeach the Informant through references to his plea agreement, the defense opened the door to questions by the prosecution about the agreement.

Next, the defense takes issue with the prosecution's questioning of the DEA Witness about whether the Informant had proven "reliable" and "truthful" in the Witness's "daily contacts" with him. At trial, the district court overruled the defendants' objections to the DEA Witness's testimony, noting that the Witness said that he had spoken with the Informant daily for four years, thus qualifying him as a character witness. The court did not abuse its discretion in so ruling, as there would have been no basis for finding impermissible vouching here.

Similarly, we find no merit to the defendants' allegation of improper vouching in the beginning of the prosecution's closing argument. Although the defendants argue that the prosecutor vouched for her own credibility by referring to her oath of office, her statement was far less extreme than the vouching that we found impermissible in *United States v. Smith*, 962 F.2d 923, 933-34 (9th Cir. 1992). Moreover, the prosecution rejoinder qualified as an "invited response" to the closing arguments of Shino's attorney and Zazueta's attorney. *See Young*, 470 U.S. at 12.

[7] The last vouching claim by the defendants centers on the prosecutor's implication that she had information not pres-

ented to the jury about George's alleged communication and association with known drug traffickers. The prosecutor's response here was "invited" by the defense's misleading description in closing argument of the evidence (or absence thereof) on this issue; the prosecutor did not "unfairly prejudice[ ] the defendant." *Id*. Having reviewed each of the defendants' allegations of vouching, we conclude that the prosecution did not engage in vouching that might warrant reversal of the defendants' convictions.

### 4. Alleged Disparagement of Defense Counsel

**[8]** According to the defendants, the prosecution improperly disparaged all four defense counsel in closing argument. The remarks the defendants cite, however, do not rise to the level of commentary that we have held to be improper. Rather than accusing the defense of fabricating a story, *see United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999), or stating that the government, unlike the defense, will ask the jury to consider all the evidence, *see United States v. Frederick*, 78 F.3d 1370, 1379 (9th Cir. 1996), the prosecutor here merely "attacked the strength of the defense on the merits, not the integrity of defense counsel," *United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002) (rejecting a challenge to a prosecutor's closing argument that accused the defense of trying "to get someone on this jury to . . . take a red herring"). We therefore find no misconduct.

### 5. Presentation of Specific Evidence

George, Shino, and Zazueta contend that the district court erred in allowing the prosecution to introduce certain evidence that they claim was prejudicial to them. Each defendant raises one such claim. George alleges that the prosecution improperly presented evidence that he previously had been arrested for shoplifting. Regardless of whether George may have had a legitimate objection to the admissibility of this evidence, his concern on appeal is solely with alleged miscon-

duct by the prosecutor in asking a *potentially* objectionable question of George's pretrial services officer. There is no authority to suggest that this rises to the level of error under the circumstances here.

**[9]** For his part, Shino claims that the prosecution, by way of its questions to George in cross-examination, improperly introduced otherwise inadmissible evidence about Shino's alleged associations with other drug traffickers. We agree. As in *United States v. Sanchez*, the prosecutor's questions here assumed facts not in evidence, there was no indication that the prosecutor could have proven the facts insinuated in her questions, and the questions reflected negatively on Shino. 176 F.3d at 1223. We therefore conclude that the district court abused its discretion in overruling Shino's objections to these questions at trial.

Finally, Zazueta argues that by asking a testifying DEA agent questions about Zazueta's brother, the prosecution acted "in direct defiance" of the district court's pretrial ruling that certain evidence was inadmissible in the prosecution's case-in-chief. Zazueta's claim has no merit. The record makes plain that the court's ruling applied only to the prosecution's attempt to present evidence that Zazueta had been present at his brother's meth lab. The prosecution respected this ruling, as it never sought to introduce such evidence. Accordingly, we find no misconduct.

### 6. *Sufficiency of Evidence to Convict Under 18 U.S.C. § 924(c)*

Count Three of the indictment charged the defendants with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). On appeal, only Nobari challenges the sufficiency of the evidence presented to convict him on this count.

**[10]** To prove that Nobari violated 18 U.S.C. § 924(c)(1)(A)(i), the government must show the following:

(1) Nobari participated in a drug trafficking crime; (2) he possessed a firearm; and (3) his possession of the firearm was "in furtherance" of the drug trafficking crime. *See United States v. Hector*, 474 F.3d 1150, 1156 (9th Cir. 2007). Nobari claims that the government failed to show that he had access to the gun during the drug transaction and that the gun was possessed "in furtherance" of the crimes for which he was convicted. We disagree. The government presented sufficient evidence to show that Nobari "possessed the weapon to promote or facilitate the underlying crime," in other words, to "further" the offense. *United States v. Krouse*, 370 F.3d 965, 967 (9th Cir. 2004). The evidence reveals a sufficient "nexus" between the gun and the underlying offense to uphold Nobari's conviction on this count. *Id.* at 968; *see also United States v. Lopez*, 477 F.3d 1110, 1115 (9th Cir. 2007).

### 7. *Jury Instructions*

The defendants present two challenges to the district court's jury instructions. Nobari and Zazueta challenge the instructions given on Count Three, concerning violations of 18 U.S.C. § 924(c), and George challenges the instructions on his entrapment defense. Our review of both sets of jury instructions is for plain error, since the defendants failed to object at trial, as they concede. *See* Fed. R. Crim. P. 30(d) ("Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b) [plain error review].").

Nobari and Zazueta argue that the district court misstated the elements of § 924(c). The defendants are correct. The court repeatedly confused two separate clauses of § 924(c), one that refers to an offender who "uses or carries a firearm" "during and in relation to any . . . drug trafficking crime" and a second that criminalizes possession of a firearm "in furtherance of any such crime." 18 U.S.C. § 924(c)(1)(A).

**[11]** Nevertheless, while we have acknowledged that there are relevant distinctions between these two clauses, *see, e.g.*, *United States v. Mann*, 389 F.3d 869, 879-80 (9th Cir. 2004), we also have described the "during and in relation to" and "in furtherance of" clauses of § 924(c) as "difficult to distinguish conceptually," in part because similar proof is required for each, *United States v. Arreola*, 467 F.3d 1153, 1160 (9th Cir. 2006). Indeed, we held in *Arreola* that § 924(c) defines just one offense, not two. *Id.* at 1161. Given the conceptual similarity between the two statutory clauses, the district court's error in conflating the clauses in its jury instructions did not "seriously affect[ ] the fairness, integrity or public reputation of" the trial. *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting *Young*, 470 U.S. at 15). Accordingly, we hold that the district court did not commit plain error in its instructions on Count Three.[2]

**[12]** We also reject George's allegation that he should have received a specific unanimity instruction on his entrapment defense. George's reliance on *United States v. Southwell*, 432 F.3d 1050 (9th Cir. 2005), is misguided. Although we held in *Southwell* that unanimity is required for a jury to reject an affirmative defense, we did not hold, as George suggests, that district courts are required to give a specific unanimity instruction on all affirmative defenses. *See id.* at 1053-55.

---

[2]The defendants claim that the district court's erroneous instructions "constituted an impermissible amendment of the indictment by the court," in violation of the Grand Jury Clause. Nobari and Zazueta cite two cases, *United States v. Castano*, 543 F.3d 826 (6th Cir. 2008), and *United States v. Combs*, 369 F.3d 925 (6th Cir. 2004), in which the Sixth Circuit reversed each defendant's conviction after he received incorrect jury instructions on § 924(c). These cases are distinguishable from the present case, however, because the judgment entered in each of the Sixth Circuit cases indicated that the jury had convicted the defendant under a different prong of § 924(c) than the one under which he was indicted. *See Castano*, 543 F.3d at 834; *Combs*, 369 F.3d at 936. Copies of the judgments against Nobari and Zazueta and their respective verdict forms show that no such error occurred here. We therefore hold that the indictment was not constructively amended. *Arreola*, 467 F.3d at 1162.

Indeed, such an instruction is not required in most cases. *Jazzabi v. Allstate Ins. Co.*, 278 F.3d 979, 986 (9th Cir. 2002). The present case does not present the unusual circumstances that might have warranted a specific unanimity instruction, and thus we find no error. *See id.*; *see also United States v. Kim*, 196 F.3d 1079, 1082 (9th Cir. 1999) ("In the ordinary case, a general unanimity instruction suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict.").

### 8.    *"Outrageous" Government Conduct*

George contends that the government engaged in outrageous conduct by failing to monitor its confidential informant, by denying the Informant's involvement in the pseudoephedrine transaction, and by allowing the Informant to engage in other allegedly offensive behavior. We disagree. To secure the dismissal of an indictment on due process grounds, "a defendant must meet an extremely high standard." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). George cannot meet this standard, as the government's alleged conduct plainly would not "violate the universal sense of justice," as required for dismissal, even were we to assume the truth of George's allegations, which he offers without citation to the record. *See id.*

### 9.    *Entrapment*

Next, George asserts that the government had insufficient evidence to prove beyond a reasonable doubt that he was not entrapped. Although we review this claim de novo, we will not overturn the jury's verdict "unless 'viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that the defendant[ ]' was neither induced nor predisposed to commit the charged offenses." *United States v. Si*, 343 F.3d 1116, 1125 (9th Cir. 2003) (quoting *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir.

1994)) (alteration in original). George cannot meet this highly deferential standard.

**[13]** George alleges inducement in the government's (successful) efforts to persuade him to reenter the drug transaction after he voluntarily had "withdrawn." Even if the jury could have found inducement on these facts, a matter on which we express no opinion, there was not "undisputed evidence" that George was induced to commit the offenses. *Davis*, 36 F.3d at 1430. That is, a "reasonable jury" also could have concluded that his initial contact with the government, via the DEA Witness, negated any claim of inducement. *Id.* Similarly, we conclude that the government's evidence was sufficient for a reasonable jury to find that George was predisposed to commit the crimes. *See id.* Accordingly, George is not entitled to a finding of entrapment as a matter of law.

## B.  Harmless Error

**[14]** Having discussed each of the challenges the defendants make to their convictions, we now consider whether any of the errors that we have identified are sufficiently prejudicial to the defendants to warrant reversing their convictions. Under *Chapman v. California*, 386 U.S. 18, 24 (1967), we must decide whether the constitutional errors committed at the defendants' trial were "harmless beyond a reasonable doubt." We have held that "prosecutorial misconduct invites reversal if it appears more probable than not that the alleged misconduct affected the jury's verdict." *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990). That said, an "important factor contributing to the prejudicial effect of improper statements is the strength of the case against a defendant." *Weatherspoon*, 410 F.3d at 1151. While we have addressed each error in a separate section of this opinion, we now must consider the errors together to determine whether reversal is required: "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitu-

tional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973)).

**[15]** We have identified three forms of error in this case: the presentation of testimony and argument that employed ethnic generalizations, prosecutorial appeals to the passions and fears of the jury, and improper questions to George about Shino's alleged association with drug traffickers. We conclude that these errors, even when considered together, were harmless to the defendants' rights to a fair trial, given the overwhelming evidence the prosecution presented against them.

To begin with, the evidence established, without question, that all four defendants were at the scene of the drug bust. The identity of the defendants was not at issue here, as it is in many criminal prosecutions. The government conclusively proved that these four individuals were at the scene, without reference to their ethnic backgrounds.

George, for example, was not arrested and charged because he was a "Middle Easterner." Rather, he was caught red-handed attempting to purchase pseudoephedrine from an undercover DEA agent after arranging the sale himself. At trial, the government presented the agent's testimony and introduced into evidence a transcript of discussions that occurred during the attempted purchase. George presented an entrapment defense at trial, which the jury rejected and which we, like the jury, do not find compelling. Even setting aside the question of whether George was induced to commit the offenses, the evidence leaves us with no doubt that he was predisposed to commit the offenses of conviction. *See Si*, 343 F.3d at 1125 ("The defense of entrapment has two elements: (1) government inducement to commit the crime and (2) an absence of predisposition on the part of the defendant to commit the crime."). Before the Turlock deal, George had arranged through his agents in Chicago to receive pseu-

doephedrine in an earlier attempted transaction that failed because, according to George, his "people in Chicago . . . kind of screwed up on their end." The transcripts of George's subsequent conversations with the Informant and the Agent also suggest that George was intimately familiar with the lingo of the pseudoephedrine trade and was ready and willing to "do business" with the government. George's entrapment defense, therefore, did not undermine the government's unassailable case against him. That he was a "Middle Easterner" did not matter.

The evidence was also conclusive, apart from any ethnic characterizations, that the other defendants arrested at the scene were not innocent bystanders. With respect to Nobari, the government presented testimony and transcript evidence demonstrating that he accompanied George to the rendezvous point initially and remained with George throughout the day of the attempted pseudoephedrine purchase. Although Nobari contends on appeal that a jury reasonably could have found that he "contribut[ed] nothing to the deal other than exchanging pleasantries with [the Agent]," this characterization of events belies the evidence. At the scene of the attempted transaction, Nobari discussed with George and the Agent how many buckets of pills would be purchased, talked to the Agent about how he and George "do business," claimed that "we want to keep making money," and boasted to the Agent that "this is our f[------] town bro, there's nobody doing s[---] in this part of town." Moreover, Nobari was in possession of a firearm at the scene, making it even less plausible that he was an innocent bystander, as he claims.

As to Shino, the government's evidence was nearly as strong. George and Nobari were in phone contact with him throughout their meeting with the Agent. Subsequently, Shino drove to the deal in the pickup truck of a convicted drug dealer, Daniel Jimenez, and, after arriving at the scene, handed a bag of money containing $20,000 to George. Moreover, a post-arrest search revealed that the key ring for the

truck that Shino drove to the deal held keys to Jimenez's residence. The evidence makes clear that, contrary to his claim before this court, Shino knew what the large amount of money he handed to George was intended to purchase.

The prosecution also presented ample evidence against Zazueta, leaving virtually no doubt of his guilt. Zazueta was present at Shino's residence when George and Nobari arrived after the Agent had shown them the pills. Later, Zazueta arrived at the scene of the attempted purchase as a passenger in Jimenez's truck, driven by Shino, and had on his person a loaded Beretta handgun with a laser sight. The Agent testified that, once Zazueta arrived, George told the Agent that "the Mexican guy . . . wants it," in reference to Zazueta's desire to obtain the pseudoephedrine.

**[16]** This survey of the evidence reveals that the errors we have identified were harmless to the defendants' rights to a fair trial. The strength of the prosecution's case assures us that the errors did not render the defense " 'far less persuasive than it might [otherwise] have been.' " *Parle*, 505 F.3d at 927 (quoting *Chambers*, 410 U.S. at 294) (alteration in original). While we remain troubled in particular by the prosecution's use of ethnic generalizations, we cannot conclude that the defendants were prejudiced by these actions, in light of the overwhelming evidence against them. Accordingly, under the *Chapman* standard of harmless error review, we hold that the errors committed at the defendants' trial were harmless beyond a reasonable doubt, and we uphold their convictions.

### C. George's Challenges to His Sentence

Only George contests the sentence that he received. George claims that, in imposing his 170-month sentence, the district court improperly calculated the Guidelines range by denying him safety valve relief under 18 U.S.C. § 3553(f), and improperly considered the sentencing factors of 18 U.S.C. § 3553(a). The Guidelines prescribe a two-level reduction

under safety valve relief for a defendant who meets the five criteria specified in § 5C1.2(a). *See* U.S.S.G. § 2D1.1(b)(9) (2006). The government does not dispute that George met the first and third criteria. *See id.* § 5C1.2(a)(1), (a)(3).

The district court held, however, that George failed to meet the fourth safety valve criterion, which requires that the defendant "was not an organizer, leader, manager, or supervisor of others in the offense . . . and was not engaged in a continuing criminal enterprise." *Id.* § 5C1.2(a)(4). The contents of the transcripts involving George, in combination with other evidence in the record, convince us that the district court was justified in finding that George led his co-defendants in these offenses. The defense argues that George "was simply a conduit between the actual buyers and the government agents" because he had to seek approval from others for the quantity of pseudoephedrine to be purchased, the purchase price, and the location of the transaction. Yet George still orchestrated the transaction, even if the ultimate purchasers, for obvious business reasons, arguably had a major influence on how much pseudoephedrine George negotiated to purchase and at what price. The district court reasonably concluded, therefore, that George was in charge.

**[17]** Because we hold that the district court did not clearly err in finding that George was a leader in the offenses and thus was ineligible for safety valve relief under the fourth criterion, *id.* § 5C1.2(a)(4), we need not consider the second and fifth criteria for relief, *id.* § 5C1.2(a)(2), (a)(5). On this basis, we uphold the district court's denial of relief to George under § 5C1.2(a) of the Guidelines.

**[18]** George also takes issue with the manner in which the district court considered the sentencing factors under 18 U.S.C. § 3553(a). The transcript reveals, however, that the district court gave proper consideration to these factors. Even if we believed that another sentence were appropriate, we may not substitute our own judgment for the district court's on

these grounds. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). Accordingly, we affirm George's 170-month sentence.

## III.    Conclusion

We affirm the convictions of all four defendants, as the only errors committed at trial were harmless. We also affirm George's sentence.

**AFFIRMED.**